**KENNATRACK CORPORATION,**
**Plaintiff,**

**v.**

**The STANLEY WORKS, Defendant.**

**Civ. A. No. 58 C 1787.**

United States District Court
N. D. Illinois, E. D.

Dec. 15, 1961.

Brown, Jackson, Boettcher & Dienner, Roy E. Petherbridge, Chicago, Ill., for plaintiff.

Keith N. Nicells, Fidler, Beardsley & Bradley, Chicago, Ill., for plaintiff-appellant.

George N. Hibben, Hibben, Noyes & Bicknell, Chicago, Ill., Lindsey & Prutzman, Hartford, Conn., for defendant.

LA BUY, District Judge.

FINDINGS OF FACT

1. The plaintiff, Kennatrack Corporation, is a corporation of the State of Indiana, having its general office and place of business at Elkhart, Indiana. Plaintiff is the owner of United States

Letters Patent No. 2,732,919 in suit which was issued to it on January 31, 1956 on an application filed June 24, 1952 by Leonard E. Johnson, Jr. and has been the owner thereof since its issuance.

2. The defendant, The Stanley Works, is a corporation of the State of Connecticut having its general office and place of business at New Britain, Connecticut.

3. Defendant is charged with infringement of claims 1 and 2 of the Johnson patent in suit by reason of its manufacture and sale of sliding pocket door frames exemplified by its Model No. 2825 and illustrated in defendant's circulars, Plaintiff's Exhibits 22 and 23. Defendant has made sales of such pocket door frames subsequent to the issuance of said patent in suit and within the jurisdiction of this Court.

4. The Johnson patent in suit is entitled "Sliding Door Frame Assembly" and relates particularly to sliding door frames of the pocket type in which the door is received within a recess or pocket in the wall of a building. Johnson illustrates in his patent drawings and describes in his specification two embodiments of his alleged invention which he says are substantially equivalent to each other. In the first embodiment of Figs. 1 to 6, inclusive, the pocket frame has a transverse header member 21 comprised of two elements, one element being a downwardly open or inverted U-shaped channel member 50, 51, 52 formed of metal and the other element being a metal track 32 secured up within the channel member. The channel member is adapted to be secured to the rough wood studding of a frame opening in horizontal position by end brackets 65 and 65a which have slots 69 permitting the brackets to be moved up or down in adjusting the track to horizontal position before the nails 70 are finally secured in place in the slot and in the wood stud. The frame also includes two vertical frame members 22, 22 forming split jambs, one of which is located at substantially the midpoint of the header member and the other being located substantially midway between the first split

jamb and the inner end of the pocket. Each of the split jambs comprises two spaced metal channels 80, 81 facing outwardly from each other and having wood insert members 90 secured within the channels. The wood insert members afford means by which wall covering materials may be nailed or otherwise secured to the frame. In each of the split jambs, the lower ends of the metal channels are tied together and secured to the floor in properly spaced relation by a metal foot plate 82. Each of the metal channels of the split jambs is provided with a vertical slot 96 through which a bolt 95 extends so as to secure the split jambs to the header. The vertical slots provide vertical adjustment of the jambs relative to the header and permit the jambs to be pivoted into vertical or plumb position during installation. A door 31 is suspended from the header member by a hanger assembly 35 having wheels 37 engaging and rolling on the track.

5. The second embodiment of Johnson's alleged invention, shown in Figs. 7 to 10, inclusive, of the drawings, is quite similar to the first embodiment except that the inverted U-shaped channel member 100 of the header instead of being metal is made entirely of wood and into which vertical slots are cut to receive the upper ends of the channel members of the split jambs. The adjustable end brackets 104 for supporting the header are also formed of wood and the Johnson patent states that

"Horizontal adjustment or lengthwise fit of the cross header 100 to meet the dimensions of the rough opening in the wall structure may be accomplished easily by shimming at the ends of the header." (Col. 7, lines 60–64).

As to this second embodiment, the Johnson patent also states:

"Turning now to the features of the modified form of my present invention, as seen in Figures 7 through 10 of the drawings, it will be recognized that the assembly therein of subject is substantially equivalent

to that heretofore illustrated and described." (Col. 7, lines 26–30)

6. Claims 1 and 2 of the Johnson patent in suit do not define any of the various elements included in the claims as being composed of any particular material and they make no specific reference to either metal or wood.

7. The patented Johnson pocket frame which was first placed on the market in 1952 was similar to that of the second embodiment of Figs. 7–10, inclusive, of the Johnson patent, having an inverted U-shaped header channel composed entirely of wood. The pocket frame of the first embodiment of Figs. 1–6, inclusive, having an all-metal header followed on the market shortly thereafter. In its advertising (Exhibit QQQ) plaintiff referred to both its wood and metal header frames as being warp proof, and Fara, plaintiff's Vice President and plant manager, stated that the matter of being warp proof referred to the split jambs with their wood fillers and not to the headers and that the metal upright with the wood inserts had eliminated the biggest problem of warpage in pocket frames. (R.192–3).

8. Although the evidence shows that plaintiff has been successful in its sales of pocket frames embodying the construction of both embodiments of the Johnson patent in suit, it has not had the kind of commercial success that would strengthen the presumption of validity or carry weight in deciding the issue of validity in a doubtful case. The record shows that plaintiff's success in its sales of pocket frames under the Johnson patent has been due to other factors rather than to any inventive quality in the patent itself, these factors being 1) the already existing demand and market for sliding pocket door frames of any kind throughout the United States due to the huge upsurge in building construction which continued for many years after World War II, 2) that plaintiff already had established itself nationally in the pocket door frame market commencing in 1945 through its sales of pocket frame hardware and it already had an existing sales force with nationally established contacts in the field, 3) plaintiff's intensive and extensive national advertising campaign which directly influenced plaintiff's sales of the Johnson pocket frame and upon which plaintiff spent considerable sums of money, 4) and the advantageous features of plaintiff's frames which were old in the prior art, because over the years since 1952 plaintiff's advertising has emphasized the warp proof character of the split jambs with the wood inserts, which had long before been disclosed in the Pitcher patent 1,831,031 of 1931 and incorporated in a pocket door frame (Exhibit UU) sold commercially in California by E. C. Pitcher and his company in the 1930's and 1940's prior to his death.

9. Plaintiff's claim of commercial success of the Johnson patent in suit is also refuted by the fact that the sales of wooden slat frames which Johnson claimed in his patent he was improving upon, have continued to increase in popularity and volume of sales during the same years plaintiff's patented frame has been sold. There are at least twenty manufacturers of hardware for wooden pocket door frames and at least twenty manufacturers who make their own wood pocket frames and their own hardware (Hezlep Dep. 11–15). The use of wooden pocket door frames has increased 100% in the West since 1949, and there has been a greater increase in the East (Hezlep Dep. 16). The sales of Acme Appliance Mfg. Co. of Monrovia, California, have substantially increased from year to year since 1949 (Hezlep Dep. 11–15). The sales of wooden pocket frames of Nordahl Sliding Door Co. of Burbank, California, which ships through the West and the Midwest has its biggest market in the Midwest in plaintiff's own territory and its sales of wooden frames have doubled over the last ten years (Fumes Dep. 6, 30). Wel-Bilt Vulcan Co. of Memphis, Tennessee, has been successful since 1952 as a wooden frame manufacturer, and its sales have increased from year to year until they exceed more

than 25,000 units annually, which are sold in every state in the Union (Webb Dep. 3, 9, 10, 15). The sales of wooden pocket frames by these companies as well as by other pocket frame manufacturers has been little affected by the frames sold under the Johnson patent in suit. Ninety percent of the pocket frames sold annually are wooden (Knouse Dep. 44, Bjorklund Dep. 9, 19). The testimony of Fara, plaintiff's Vice President, that there were between 300,000 and 400,000 frames sold per year of which 100,000 were metal is unreliable as it constitutes merely an estimate based upon estimates of others and not upon reliable figures, although, by this testimony itself, plaintiff concedes that the wooden frames still far outsell the metal frames.

10. Grant Pulley & Hardware, Lawrence Brothers and American Screen Products have been licensed (Exhs. TTT, UUU, VVV) under the Johnson patent in suit, and they have paid $22,300.00 in royalties (R. 160, 164). These licensees are relatively small concerns with low production and they accepted the licenses on favorable terms to themselves after they had been notified of infringement, the license to Lawrence Brothers having been taken two years after one of Lawrence Brothers' distributors had been sued for infringement. The sales of metal frames by these licensees have been small as compared to sales by individual wood pocket frame manufacturers.

11. The prior art Pitcher patent 1,831,031 granted November 10, 1931 (Exhibit IIII) discloses a sliding door pocket frame composed principally of metal which may be shipped in assembled or in a knock down condition (P. 1, Col. 1, lines 7–9). Pitcher shows in Figs. 1, 2, and 3, a horizontal U-shaped metal channel or header 5 from which is supported a downwardly extending channel iron 14 carrying a track 20 and a split jamb comprising two outwardly facing channels 2 and 3 provided with wooden filler strips 37. A sliding door 26 is supported by hangers 32 from rollers which engage the track. Brackets 6 and 7 support the metal channel 5 from the vertical metal channels 4 and 8. In Fig. 7, Pitcher shows two spaced vertical split jambs or split studs connected to the header, one of the split jambs being located at the midpoint of the header and the other being located midway between the one split jamb and the inner end of the pocket frame. This location and spacing of Pitcher's split jambs are substantially the same as in the Johnson patent in suit. Each of the Pitcher split jambs comprises two spaced, outwardly facing metal channels provided with wood filler strips or inserts in each of the channels, this construction being the same as in the Johnson patent in suit. The wood fillers permit lath or wall board to be secured thereto.

12. The prior art Pitcher patent 1,832,050 granted November 17, 1931 (Exhibit JJJJ) is similar in general overall structure to the Pitcher patent 1,831,031 as it shows outwardly facing metal channels forming split jambs. In addition, it discloses the details of construction of adjustable door hangers by which the sliding door may be leveled in a manner generally the same as in the Johnson patent in suit.

13. E. C. Pitcher, the inventor of the Pitcher patents 1,831,031 and 1,832,050 and doing business as E. C. Pitcher Co. of San Francisco, California, commercially made and sold during the 1930's and 1940's until his death in the late 1940's sliding door pocket frames of the wood type and of the metal type. Pitcher's commercial metal frame which is shown in detail in an instruction sheet (Exhibit UU) dated May 12, 1943 and distributed by Pitcher for advertising purposes, embodied many of the features of the Pitcher patents but, in addition, had foot plates at the bottom of the split jambs and means associated with the header for leveling the track. Exhibit UU bears the notation "Patented Nov. 10, 17, 1931" which are the dates of the Pitcher patents. Defendant produced the deposition testimony of a plurality of witnesses taken in California

and supporting documentary evidence including dated correspondence, price lists, an invoice, drawings and other records conclusively proving beyond a reasonable doubt the manufacture and sale of the Pitcher frame (Exhibit UU) prior to Johnson's filing date. Neither the Pitcher commercial frame nor Exhibit UU were cited by the Patent Office during the prosecution of the Johnson application.

14. The Pitcher commercial frame as illustrated in Exhibit UU comprised a transverse wood header adapted to be secured in horizontal position between the vertical studs of a rough wood opening. A steel rail which carried a track at its lower side was suspended from the wood header by two adjustable bolts, one adjacent each end of the wood header and the steel rail. By means of the adjusting bolts the track was adjusted into horizontal position so that the door suspended from the track on rollers would roll in a horizontal plane. Brackets, one at each end of the steel rail, anchored the ends of the steel rail to the wood studs after the track had been adjusted to horizontal position. The adjustable bolts and brackets of the Pitcher frame were the same in principle and mode of operation, and achieved the same result as the slotted brackets of the Johnson patent in suit. Two split studs or split jambs were secured to the wood header in spaced relation, each split jamb comprising two spaced, outwardly facing metal channel members welded at their lower ends to a foot plate which was adapted to be secured to the floor when the jamb was plumbed to vertical position, and to maintain in the channels in properly spaced relation so that the door passed between them. A wood filler strip was located in each of these metal channels so that wall board or lath could be nailed thereto. The foot plates and the split jambs of the Pitcher frame were substantially the same in structure, achieved substantially the same results and performed substantially the same functions as the foot plates and split jambs of the Johnson patent in suit.

The upper ends of the split jambs were received and slidable within grooves or crozes cut into the vertical side surfaces of the wood header, and they were secured to the wood header by means of two nails on each side. The split jambs of the Pitcher frame were vertically adjustable relative to the header and could be swung laterally in the plane of the door to adjust the jambs to vertical position in a manner similar to the Johnson patent. The height of the door could be adjusted by adjustable hangers connected to the rollers which engaged the track. The frame was shipped in knock down condition.

15. Pitcher's commercial frame (Exhibit UU) had all of the essential features of the pocket frame of the Johnson patent and its structure, mode of operation and result were substantially the same as the Johnson pocket frame. Hence, the pocket frame of the Johnson patent in suit was not the first substantially all-metal pocket frame to be sold commercially and which could be shipped in knock down condition as that had already been accomplished by Pitcher with his frame of Exhibit UU.

16. The Forgette et al. patent 2,564,-968 (Exhibit HHHH) was granted August 21, 1951 to Alexander J. Forgette, Murrell R. Spence and Noah O. A. Hayman. This prior art patent was not cited by the Patent Office during the prosecution of the application of the Johnson patent in suit. The Forgette et al. patent shows a sliding door frame of the wood pocket type having a wood header 4 for supporting the rollers of a sliding door, and also having a split jamb composed of wood uprights 5 and 6 which are associated with channel-shaped metal stiffeners to make the construction more rigid. A floor plate 8 extends across the bottom surfaces of the two spaced jamb members 5 and 6 and is secured thereto. The floor plate, like that of the Johnson patent in suit, serves to maintain the jamb members 5 and 6 in properly spaced relation and to anchor the jamb members to the floor in plumb position by means of nails inserted through holes in the

floor plate. The Forgette floor plate is substantially the same in structure, mode of operation and result as the floor plate of the Johnson patent in suit.

17. The pocket frame structure of the Forgette et al. patent including the floor plate was commercially sold before Johnson filed his application, and it is still being sold. Floor plates exemplified by Exhibit P were made and sold in 1948 by Nu-Way Builders Corporation (later known as Nudor Manufacturing Company) as part of complete wood pocket frames and commencing in 1950 these foot plates were sold separately to other manufacturers by Nudor or by its subsidiary, National Metal Products Co. Such sales had continued to the date Mr. Spence, one of the Forgette et al. patentees, gave his deposition in 1960.

18. The prior art Schuyler et al. patent 856,607 (Exhibit KKKK) discloses a combined hanger and track for slidable pocket doors comprising a horizontal metal track upon which door supporting rollers travel. The track is supported at its respective ends from the rough wood studding by means of slotted brackets which are adjustable so that the metal track may be leveled to horizontal position. The slotted adjustable bracket means of Schuyler are substantially the same in general structure, mode of operation and result as the slotted adjustable bracket means for leveling and supporting the header of the Johnson patent in suit.

19. The prior art Faris patent 2,220,400 (Exhibit LLLL) shows a pocket door frame for sliding doors comprising a header H of wood or metal to the underside of which there is secured a U-shaped metal track member 11 having internal lower edges 12 forming rails which are engaged by door supporting rollers 37. The Faris track is of the same general configuration as the track of the Johnson patent in suit and its function and result are identical to Johnson's track.

20. The Goldsmith patent 1,654,970 (Exhibit OOOO) shows and describes a door frame construction wherein two upright side frame members 12, 13 carry bolts 27 at their upper ends which are slidably received within elongated vertical slots 25 in brackets 24 secured to the ceiling. This slot and bolt connection permits the door frame members to be adjusted vertically and also laterally by a pivotal action in a manner substantially the same and with substantially the same result as the bolt and slot connection between the split jambs and the header of the Johnson patent in suit.

21. The prior art patents to Faris 2,220,400 (Exhibit LLLL), Byron 1,407,251 (Exhibit MMMM) and Tyler 381,041 (Exhibit NNNN) also teach that slot and bolt, nail or screw connections were old and well known means for adjustably securing two elements together prior to Johnson's use thereof on his split jambs and bracket. Defendant's witness Stowell gave testimony which is not denied or disputed by plaintiff that the use of a slot and a fastening member in the slot for adjustably connecting two elements together had been known to him as a boy, and prior to Johnson had been used, for examples, in jig saws, license plate holders, brake systems, carburetors, hangers for factory shafting, bicycle seats, carpenters' bench planes, gauging devices, wall plates and window shade holders.

22. The prior art Richards-Wilcox catalog (Exhibit PPPP) published in 1945 shows a slatless wooden pocket door frame having a transverse header, a first split jamb member connected to the header "at substantially the midpoint of the latter", and a second split jamb member "at a position substantially midway of the length of the pocket door". This spaced arrangement of the split jambs is the same as that described in the Johnson patent and as called for in claim 2 thereof. The Richards-Wilcox frame has no slats, the same as Pitcher and Johnson.

23. Starting in 1945 and prior to Johnson's alleged invention of the patent in suit, plaintiff sold a line of hardware for pocket door frames shown in its prior art catalogs and publications (Exhibit

YYY and ZZZ). This line is still being sold by plaintiff. As shown on page 6 of plaintiff's catalog of September 1949 (Exhibit YYY), plaintiff sold a track almost identical to that shown in Fig. 2 of the Johnson patent and which was mounted up within an inverted U-shaped channel member or header composed of wood as shown on page 7 of Exhibit YYY. This prior art header and track arrangement of plaintiff was substantially the same as the channel and track arrangement shown in Fig. 10 of the Johnson patent in suit. The prior art hanger and roller assembly also sold by plaintiff and also shown on page 6 of Exhibit YYY and on page 5 of plaintiff's catalog of February 1, 1950 (Exhibit ZZZ), is similar in structure, principle, mode of operation and result as the hanger and roller assembly shown in Fig. 2 of the Johnson patent in suit. Johnson utilized the structures of these old elements of plaintiff's line of hardware in his pocket frame without any change in function or result.

24. All of the elements of the frame structure defined by claims 1 and 2 of the Johnson patent in suit were old and well known in the art of sliding door pocket frames and in the art of building construction long prior to Johnson. In forming the frame of the Johnson patent in suit, these old elements perform their same old functions without modification and achieve no unusual or surprising consequences by their unification. The Johnson pocket frame constitutes an aggregation of old elements which has not added to the store of human knowledge and which in no way exceeds the sum of its parts.

25. The Pitcher commercial frame (Exhibit UU) had a plain wood bar as one of the elements of the header-track member rather than an inverted U-shaped wooden channel member of the Johnson patent, and had a somewhat different means of connection between the split jambs and the header as compared to the slot and bolt connection of the Johnson patent. An inverted U-shaped channel member for supporting a track up within the channel and a bolt and slot connection as a means for adjustably connecting two elements together were old in the art, and since their selection by Johnson was a matter of choice, they could readily have been substituted and used in Pitcher's commercial frame with the same results. Such an aggregation of elements could have easily been accomplished by any man skilled in the art of pocket frames.

26. The Johnson patent is not a pioneer quality. Johnson worked in a crowded art and whatever advance he may have made was of very narrow character. Consequently, in determining the issue of infringement, the claims of the Johnson patent must be strictly construed and limited to the precise structure disclosed and claimed.

27. Defendant's accused pocket frame does not infringe Claims 1 and 2 of the Johnson patent in suit because defendant's frame has omitted one of the elements of the combination expressly defined by the claims. Claim 1 specifically calls for a two-piece header-track assembly, as follows:

"a transverse header member comprising

"1) a downwardly open channel member

"2) and a track member disposed within said channel member, said channel and track members being designed to support the weight of a door,"

and the claim then states:

"such header member being of such length that when horizontally disposed its ends will engage the opposed faces of the stud."

Defendant's accused frame does not respond to this language of the claims since it lacks the downwardly open channel member, and employs only the track member which is in two telescoping sections to provide adjustability to fit different sizes of rough openings. In omitting the downwardly open channel member an equivalent structure or element

has not been substituted in defendant's frame.

28. Plaintiff is also estopped by proceedings in the Patent Office during the prosecution of the application of the Johnson patent in suit to contend for a broad interpretation of Claims 1 and 2 of the patent. Johnson first presented claims directed to a header member broadly and not limited to a two element header comprising a downwardly open channel member and a track member within the channel, as the claims now read. The claims directed to a header member broadly were rejected by the Patent Office and, thereafter, Johnson acquiesced in the rejection and cancelled those claims and presented the very limited claims which were allowed. Plaintiff is not entitled to resort to the doctrine of equivalents to regain what he has disclaimed in the Patent Office.

## CONCLUSIONS OF LAW

1. The prior art Tyler patent 381,041, the Byron patent 1,407,251, the Forgette et al. patent 2,564,968, the Goldsmith patent 1,654,960, the Pitcher commercial frame shown in Defendant's Exhibit UU and the Richards-Wilcox catalog were not cited by the Patent Office during the prosecution of the application for the Johnson patent in suit, and consequently, no presumption of validity of the Johnson patent exists with respect to that prior art.

2. Under 35 U.S.C. § 103, the Court finds, as a matter of law, that the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the alleged invention was made to a person having ordinary skill in the art of pocket door frames and building construction.

3. Claims 1 and 2 define an aggregation of elements old and well known in the art of sliding door pocket frames and they perform the same function in the aggregation as they had previously performed out of it. The unification of these old elements by Johnson did not achieve any unusual or surprising consequences and such unification did not amount to invention.

4. Claims 1 and 2 of the Johnson patent 2,732,919 in suit are invalid for lack of invention over the cited prior art.

5. Defendant's accused pocket frame Model No. 2825 does not infringe claims 1 and 2 of the Johnson patent No. 2,-732,919.